| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br><br>**Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>Gary F. Seitz<br>Gellert Seitz Busenkell & Brown, LLC<br>1201 N. Orange St., Suite 300<br>Wilmington, DE 19801<br>Phone: 302-425-5800<br>Email: gseitz@gsbblaw.com<br><br>*Attorneys for Nicole Testa Mehdipour, Chapter 7 Trustee of Excell Auto Group, Inc.* | |
| In re:<br><br>AVRUMI LUBIN a/k/a JOSH LUBIN<br><br>Debtor. | Chapter 11<br><br>Case No.: 26-17342 (ELO) |
| NICOLE TESTA MEHDIPOUR, Chapter 7 Trustee for the estate of Excell Auto Group, Inc.<br>Plaintiff,<br>v.<br><br>AVRUMI LUBIN a/k/a JOSH LUBIN<br>Defendant. | Adv. Pro. No. |

**COMPLAINT TO DETERMINE DISCHARGEABILITY**
**AND OBJECTING TO DISCHARGE**

Nicole Testa Mehdipour ("**Trustee**" or "**Plaintiff**"), in her capacity as Chapter 7 trustee for the bankruptcy estate of Excell Auto Group, Inc. ("**Excell**"), files this Complaint to determine dischargeability of the debtor pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6) and objecting to the discharge of Avrumi "Josh" Lubin (the "**Debtor**" or "**Lubin**") pursuant to 11 U.S.C. §§ 727(a)(3), (a)(6)(A), and (c), and Fed. R. Bankr. P. 4004 and 4007.



#68867092 v1

**Jurisdiction and Venue**

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue is proper in this district under 28 U.S.C. § 1409(a). This adversary proceeding is related to a bankruptcy case under Chapter 11 that is pending in this district (Case No. 26-17342(ELO)).

3. This adversary proceeding is commenced pursuant to section 727(c) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 4004(a) and 7001(4).

4. Trustee consents to entry of a final order or judgment by the Bankruptcy Court in this matter.

**Parties**

5. The Trustee is the duly appointed Chapter 7 trustee of the Excell Auto Group, Inc. bankruptcy estate in the bankruptcy case styled *In re Excell Auto Group, Inc.*, Case No. 22-12790-EPK, pending in the United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division ("**Florida Bankruptcy Court**").

6. Plaintiff filed an adversary complaint on June 30, 2023, instituting the adversary proceeding styled *Mehdipour v. Hi Bar Capital, LLC, et al.*, Adv. Pro. No. 23-01132-EPK ("**Florida Adversary Proceeding**"). In the Florida Adversary Proceeding, the Plaintiff sought relief against Lubin and other defendants for violating Federal Civil RICO, conspiracy to violate Federal Civil RICO, and other related relief.

7. Lubin is the debtor in the above-captioned Chapter 11 case.

**Related Non-Parties**

8. Spin Capital, LLC ("Spin") is a New Jersey limited liability company, 100% owned by Lubin.

9. Hi Bar Capital, LLC ("Hi Bar"), is a New York limited liability company, owned by Yisroel Herbst, individually, and through another entity owned and controlled by Yisroel Herbst.

**Factual Allegations**

**I. Section 523 Factual Allegations**

**A. History of the Excell**

10. Excell is a Florida corporation with its principal business in Boca Raton, Florida.

11. Excell was formed for the stated purpose of selling high-end luxury vehicles primarily to end users.

12. Scott Zankl, who at all relevant times, was not an owner of Excell, was primarily responsible for running the day-to-day operations of Excell.

13. Excell was considered a used car dealership, so Excell was ineligible for more favorable lending terms of new car dealerships from traditional lending sources.

14. On April 8, 2022 (the "**Excell Petition Date**"), Excell filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code (11 U.S.C. §§ 101, *et seq*.).

**B. Spin and Hi Bar are Predatory Merchant Cash Advance Lenders**

15. Merchant Cash Advance ("MCA") lenders are lenders of last resort, and for many borrowers, MCA loans are often the death knell of a borrower/business.

16. MCA lenders attempt to disguise the MCA agreements, which are in fact loans, as the purchase of receivables or future revenue streams.

17. MCA lenders use the false guise of purchases of receivables or future revenue streams to shield themselves from state usury laws.

18. In this case, Spin and Hi Bar are MCA lenders that attempted to shield themselves from state usury laws by drafting their agreements as purchases of "future receivables" or "future receipts." Spin and Hi Bar use the same form of contract with minimal if any material changes for each of the Spin Contracts (defined below) and the First Hi Bar Contract (defined below).

19. Excell had little to no receivables that could be purchased by Spin or Hi Bar, because Excell had essentially stopped selling cars to end users and was primarily borrowing money and recirculating the borrowed funds from new lenders to pay prior investor loans.

20. Even if Excell had been selling vehicles and had receivables or receipts to pledge, the substance of the Spin and Hi Bar transactions demonstrate that Spin and Hi Bar loaned money to Excell rather than purchasing future accounts receivables or receipts.

**C. <u>The First Spin Contract</u>**

21. On or about June 1, 2021, Spin and Excell, along with 13 non-debtor entities related to Scott or Kristen Zankl entered a "Revenue Purchase Agreement" (the "**First Spin Contract**").

22. The First Spin Contract terms included: (i) the "Purchase Price" was listed as $1,000,000.00: (ii) the "Remittance" was $93,687.50 per week; and (iii) "Purchased Amount" was $1,499,000.00.

23. On June 1, 2021, Excell received from Spin a wire transfer of $950,000.00 reflecting the "$1,000,000 "Purchase Price" less certain fees charged by Spin.

24. The terms and conditions of the First Spin Contract are identical, or substantially similar, to the Second Spin Contract and Third Spin Contract.

25. Spin designed the First Spin Contract to misrepresent the true nature of the transaction and avoid applicable criminal usury statutes.

**D. <u>The Second Spin Contract</u>**

26. At the end of June 2021, Josh Lubin reached out to Scott Zankl inquiring whether any additional funding was needed. Thereafter, Josh Lubin and Scott Zankl began negotiating a second agreement.

27. On July 8, 2021, Josh Lubin texted Scott Zankl stating, "I'll fund $500k without any login or statements…."

28. On July 9, 2021, Spin, on the one hand, and Excell along with 13 non-debtor entities in which Scott and Kristen Zankl had an ownership interest, on the other hand, entered a "Revenue Purchase Agreement," including Addendum to the Future Receivables Sale and Purchase Agreement and Guaranty, Merchant Agreement Terms and Conditions, Security Agreement and Guaranty of Performance, Guaranty of Performance, Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit, Appendix A – The Fee Structure, and Bank Login Information. Collectively, these documents shall be known as the "**Second Spin Contract.**"

29. The Purchase Price is listed as $500,000 with the Purchased Percentage being 20% and the Purchased Amount is $749,500.00. The weekly payment remittance was $40,000.00, to be debited daily by Spin. On July 9, 2021, Excell received a wire transfer from Spin Capital in the amount of $475,000.00.

30. Based upon the weekly ACH withdrawal of $40,000.00, the loan would be paid off in just 18.77 weeks, which translates to an annual interest rate of more than twice the amount of the criminal usury rate under applicable New York law.

31. Spin designed the Second Spin Contract to misrepresent the true nature of the transaction and avoid applicable criminal usury statutes.

**A. <u>The Third Spin Contract</u>**

32. On August 31, 2021, Spin issued a Balance Transfer Agreement letter. As of August 31, 2021, Spin represented that Excell owed $281,062.50 on account of the First Spin Contract and $469,500.00 on account of the Second Spin Contract. Excell and Spin agreed to deduct these outstanding balances from a "new Merchant Agreement."

33. On August 31, 2021, Spin, on the one hand, and Excell, including Scott and Kristen Zankl and a list of their other non-debtor entities related to Scott or Kristen Zankl, on the other hand, entered into another "Revenue Purchase Agreement." The Revenue Purchase Agreement dated August 31, 2021, along with Addendum to the Future Receivables Sale and Purchase Agreement and Guaranty, Merchant Agreement Terms and Conditions, Security Agreement and Guaranty of Performance, Guaranty of Performance, Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit, Appendix A –Collectively, these documents are the "**Third Spin Contract**."

34. The Purchase Price is listed as $2,000,000 with the Purchased Percentage being 20% and the Purchased Amount is $2,998,000.00. The weekly payment remittance was $150,000.00, to be debited weekly by Spin.

35. On September 2, 2021, Excell received a wire transfer in the sum of $1,099,437.50 via wire transfer from Spin Capital.

36. Therefore, in exchange for entering the Third Spin Contract, Excell was obligated to pay Spin Capital a minimum of $2,998,000 in exchange for Excell receiving $1,099,437.50.

37. Based upon the weekly ACH withdrawal of $150,000.00, the loan would be paid off in just 19.98 weeks which translates to an annual interest rate of more than twice the amount of the criminal usury rate under applicable New York law.

38. Spin designed the Third Spin Contract to avoid applicable criminal usury statutes, but the Third Spin Contract was nothing more than a disguised loan.

39. Collectively, the First Spin Contract, Second Spin Contract, and Third Spin Contract shall be referred to as the "**Spin Contracts**."

**B. The First Hi Bar Contract**

40. Josh Lubin then had Excell executed the Hi Bar Transfer Agreement. The Hi Bar Transfer Agreement was purportedly signed by Kristen Zankl on October 28, 2021, and signed by Scott Zankl on November 1, 2021. Through the Hi Bar Transfer Agreement, Excell agreed that there was still a balance due and owing on the Third Spin Contract in the amount of $2,114,312.50.

41. The Hi Bar Transfer Agreement states that $2,114,312.50 would be transferred from Spin to Hi Bar and that the $2,114,312.50 would be deducted from a "new Merchant Agreement" to be entered into between Excell and Hi Bar.

42. Josh Lubin negotiated the Hi Bar Capital Transfer Agreement on behalf of Spin and Hi Bar.

43. Josh Lubin directed employees of Hi Bar the drafting of the Hi Bar Transfer Agreement.

44. On or about October 27, 2021, Hi Bar, on the one hand, and, on the other hand, Excell, along with 14 non-debtor entities, which are the same 13 non-debtor entities included in the Spin contracts with Karma of Palm Beach being duplicated, entered a "Revenue Purchase Agreement." The Revenue Purchase Agreement dated 10/27/2021 along with Merchant Agreement Terms and Conditions, Security Agreement and Guaranty of Performance, Guaranty of



#68867092 v1

Performance, Authorization Agreement for Direct Deposit (ACH Credit), Direct Payments (ACH Debits), and Check Debit, Appendix A – The Fee Structure, Bank Login Information, and Addendum to the Future Receivables Sale and Purchase Agreement and Guaranty are collectively referred to as the "**First Hi Bar Contract**."

45. Debtor negotiated the First Hi Bar Contract with Excell and its affiliates on behalf of Hi Bar. Debtor dictated the terms to Hi Bar Employees and directed Hi Bar employees to prepare the First Hi Bar Contract.

46. The Purchase Price in the First Hi Bar Contract is listed as $2,120,000.00 with the Purchased Percentage being 20% and the Purchased Amount is $3,177,880.00. The Purchase Price is $5,687.50 ($2,120,000.00-2,114,312.50) more than the "transferred balance" from Spin.

47. Hi Bar, however, did not transfer any funds to Excell on account of the First Hi Bar Contract.

**i. <u>The First Hi Bar Contract and HI Bar Transfer Agreement Were Created to Effectuate a Fraud on a Third-Party And No Consideration Was Paid</u>**

48. The First Hi Bar Contract, Hi Bar Capital Prepayment Discount Addendum, and Hi Bar Transfer Agreement, were sent by Hi Bar to Scott and Kristen Zankl in a single, DocuSign Envelope, Envelope Id: CCF1032FABA743AEA1DBE74E050DF9DC (the "**Envelope**").

49. The applicable Time Zone for determining when each task was completed is "Pacific Time (US & Canada)."

50. An electronic signature for Kristen Zankl was added to each of the documents in the Envelope on 10/20/2021 at 4:11:12 AM (Pacific Time) or 7:11:12 AM (Eastern Time). An electronic signature for Scott Zankl was added to each of the documents in the Envelope on 11/1/2021 at 11:39:35 AM (Pacific Time) or 2:39:35 PM (Eastern Time). Approximately forty-two minutes after Scott Zankl signed the Envelope, at 3:22 p.m., Spin wired $2,114,312.50 to Hi Bar.

51. Forty-four minutes later, at 4:06 p.m., Hi Bar wired back to Spin $2,114,312.50.

52. On November 1, 2021, Hi Bar did not have the $2,114,312.50 to fund the First Hi Bar Contract in its account without Spin advancing the funds.

53. The First Hi Bar Contract reads: "[Hi Bar's] payment of the Purchase Price shall be deemed the acceptance and performance by [Hi Bar] of this Agreement."

54. Seven minutes after Hi Bar wired back the $2,114,312.50 to fund the First Hi Bar Contract, at 1:13:20 PM (Pacific Time) or 4:13:20 PM (Eastern Time), purportedly transferring the outstanding Spin balance to Hi Bar, Debtor executed an Assignment Document transferring Spin's obligations and claims to a third-party, Wing Lake, who funded $6 million to Excell.

55. The Hi Bar Transfer Agreement is a document titled "Hi Bar Capital Balance Transfer Agreement," dated October 27, 2021, and is purported to be electronically signed by Kristen Zankl, individually and on behalf of Excell Auto Group, Inc. only, on October 28, 2021, and electronically signed by Scott Zankl on November 1, 2021.

**C. <u>The First and Second Settlement Agreements</u>**

56. Lubin, through and on behalf of Hi Bar then claimed Excell defaulted under the First Hi Bar Contract and strongarmed Excell into entering a settlement agreement and purportedly increasing the outstanding balance by more than 150% from $2,677,880.00 to $4,016,820.00. The "**First Settlement Agreement**."

57. Lubin then claimed there was a purported default under the First Settlement Agreement and sued Excell. Excell entered into a new Settlement Agreement requiring Excell to repay Hi Bar $3.8 million over 9 days. The "**Second Settlement Agreement**."

58. As a result of Lubin's actions, Excell paid $2 million more to or on behalf of Lubin, Spin and Hi Bar.

**D. <u>The Florida Adversary Proceeding</u>**

59. On June 30, 2023, the Plaintiff filed her adversary complaint instituting the Florida Adversary Proceeding. Between January 28, 2026, and February 6, 2026, a trial was held in the Florida Adversary Proceeding.

**Count 1**
**Non-Dischargeability under 11 U.S.C. §523(a)(6)**

60. Plaintiff realleges paragraphs 1 through 58 above and incorporates those allegations by reference.

61. 11 U.S.C. § 523(a)(6) reads:

> A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-*** for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

62. The debt owed by Lubin to Excell arises from Lubin willfully causing his entities to issue the Spin Contracts and First Hi Bar Contract which he knew or should have known were charging interest far exceeding 25% per annum and collecting on these loans.

63. Lubin's actions in issuing and collecting on these loans with interest far exceeding 25% per annum were malicious in that his actions were willful.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of Plaintiff finding that any debt owed by Lubin to Excell is not dischargeable under 11 U.S.C. § 523(a)(6).

**Count 2**
**Non-Dischargeability under 11 U.S.C. §523(a)(2)(A)**

64. Plaintiff realleges paragraphs 1 through 58 above and incorporates those allegations by reference.

65. 11 U.S.C. § 523(a)(2)(A) reads:

> A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-*** for



#68867092 v1

> money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-- false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

66. The debt owed by Lubin to Excell is one for money obtained from Excell.

67. The debt owed by Lubin to Excell is one obtained by false pretenses, a false representation, or actual fraud.

68. Lubin misrepresented the terms of the funding transaction Excell was entering into with Spin and Hi Bar.

69. Lubin misrepresented the rate of return at which Excell was expected to pay on the loans to Spin and Hi Bar.

70. The statements made by Lubin had nothing to do with Lubin's or an insider's financial condition.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of Plaintiff finding that any debt owed by Lubin to Excell is not dischargeable under 11 U.S.C. § 523(a)(2)(A).

**Count 3**
**Objection to Discharge under 11 U.S.C. § 727(a)(4)**

71. 11 U.S.C. § 727(a)(4) reads

> (a) The court shall grant the debtor a discharge, unless-- (4) the debtor knowingly and fraudulently, in or in connection with the case-- (A) made a false oath or account; (B) presented or used a false claim; (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

72. Section 727(a)(4) is written in the disjunctive and provides several bases for denying a debtor's discharge.

73. Debtor has failed to properly disclose his assets, debts, or income in his petition, schedules, and statement of financial affairs.

74. Debtor failed to list the Plaintiff as a creditor in his bankruptcy case.

75. Debtor has failed to identify any creditors other than the FVP and Franklin Parties.

76. Debtor has scheduled very little interest in property and scheduled most values as "unknown."

77. Debtor failed to properly schedule various transfers of his interest in companies such as Spin.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of Plaintiff finding and denying Lubin a discharge under 11 U.S.C. § 727(a)(4).

**Count 4**
**Objection to Discharge under 11 U.S.C. § 727(a)(3)**

78. 11 U.S.C. § 727(a)(3) reads:

> (a) The court shall grant the debtor a discharge, unless--(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

79. Upon information and belief, Debtor has failed to keep or is concealing recorded information from which Debtor's financial condition or business transactions might be ascertained.

80. Any action by the Debtor in failing to keep or actively concealing recorded information is not justified under any circumstances of the case.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of Plaintiff finding and denying Lubin a discharge under 11 U.S.C. § 727(a)(3).

Dated: September 21, 2026

GELLERT SEITZ BUSENKELL & BROWN, LLC

By: */s/ Gary F. Seitz*

Gary F. Seitz, Esq.
1201 N. Orange St., Suite 300
Wilmington, DE 19801
Phone: 302-425-55800
Email: gseitz@gsbblaw.com

Jason S. Rigoli, Esq. (PHV forthcoming)
Alan R. Case, Esq. (PHV forthcoming)
GrayRobinson, PA
One Boca Place
2255 Glades Road, Suite 301E
Boca Raton, Florida 33431

*Attorneys for Nicole Testa Mehdipour, Chapter 7 Trustee of Excell Auto Group, Inc.*