Avrumi Lubin, Debtor, pro se
1460 Arboretum Parkway
Lakewood, NJ 08701
732-608-4905 | josh@tetonfunding.com

U.S. DISTRICT COURT DISTRICT OF NEW JERSEY RECEIVED
2026 NOV 18 P 3:11

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br>**AVRUMI LUBIN a/k/a JOSH LUBIN,**<br>Debtor. | Case No. 26-17342 (EJO)<br>Chapter 11<br>Hearing: not set |

**CERTIFICATION OF AVRUMI LUBIN IN SUPPORT OF THE OBJECTION**

1. I am Avrumi Lubin, the individual debtor. I submit this certification in my own capacity, not on behalf of Spin Capital, LLC, another company, or a trust.

2. Before the October 2026 orders in Adv. No. 26-01494, I managed Spin. Through that role I became familiar with its participation as a creditor in the Jet bankruptcy and its interest in the RWDY matter.

3. In Jet, Spin appeared through counsel and joined Goat Advance, LLC and Reserve Capital Management, LLC in a proceeding against Jet. The docket entries reproduced in Exhibit A are consistent with my understanding of that participation.

4. I have reviewed Exhibit A. It identifies the public sources and reproduces a directory excerpt, the complete seven-page RWDY decision, selected pages of the confirmation order and plan, and selected Jet docket pages. I rely on those records for their contents. I have no personal knowledge of Eisner's proposed staffing, internal conflict search or any assumption of liabilities. I do not certify a current appeal status, a damages recovery, or an insurance payment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. section 1746.

Dated: 11/18/26

Avrumi Lubin, Debtor, pro se

# EXHIBIT A

## PUBLIC RECORDS SUPPORTING THE OBJECTION

**Part 1. Current applicant directory.** The following excerpt identifies Trent Millican as a partner of Eisner Advisory Group LLC. The directory describes his prior position at P&N. Source captured November 18, 2026.




www.eisneramper.com/about-us/professional-directory/trent-millican/
Practice structure: www.eisneramper.com/firm-disclosure/

**Part 2. RWDY decision - seven complete pages.** *In re RWDY, Inc.*, No. 22-11308 (Bankr. W.D. La.), ECF No. 561 (Mar. 24, 2025). The complete decision, including its denial of relief and explanation of issues not decided, follows. GovInfo: complete RWDY decision.

**Part 3. Confirmation order and plan - seven selected pages.** RWDY ECF No. 501 (Nov. 25, 2024), ECF-stamped page **6** and Exhibit A, pages **17, 20 and 36-39**. Order paragraph 1 confirms the attached plan. The excerpts identify Spin and the trusts and reproduce section 5.6.3 through the distribution limits. Other portions are omitted. GovInfo: confirmation order and plan.

**Part 4. Jet docket - three selected pages.** *In re Jet Oilfield Services, LLC*, No. 22-70126 (Bankr. W.D. Tex.). Pages **17, 24 and 47** of the June 27, 2026 docket printout show ECF Nos. 80, 111 and 193. They establish the recorded employment and creditor proceeding, not Millican's participation in Jet.

**SO ORDERED.**

**DONE and SIGNED March 24, 2025.**

JOHN S. HODGE
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case Number: 22-11308 |
| | § | |
| RWDY, Inc. | § | Chapter 11 |
| | § | |
| Debtor | § | |

**Memorandum Opinion and Order**

The Bankruptcy Code permits a trustee to employ professionals to perform services for the estate. A trustee may employ only disinterested persons that do not hold or represent an interest adverse to the estate.

Here, the chapter 11 debtor employed accountants. The court awarded the accountants $139,000 in interim compensation. Thereafter, Debtor's management concluded that certain actions or inactions of the accountants enabled a prior officer of Debtor to embezzle millions of dollars. The accountants deny any wrongdoing. Once the dispute arose, the accountants ceased rendering services and did not seek additional compensation or file a final fee application.

A party in interest seeks disgorgement of fees paid to the accountants on the grounds that they were not disinterested and held an interest adverse to the estate for the entirety of their employment. The moving party also asks the court to rescind its order authorizing the retention of the accountants on the same grounds.

For the reasons stated, the relief requested is denied.

## Factual Background

RWDY, Inc. ("**Debtor**") is an oilfield consulting company headquartered in Bossier City, Louisiana. In 2020, Debtor filed its first chapter 11 case. In January 2021, this court confirmed Debtor's plan of reorganization. As part of the plan, a distribution trust was established. The plan provided for the continuation of employment of Debtor's then-president, Brian T. Owen ("**Owen**"). Under the plan, Owen was entitled to a fixed salary plus additional compensation under certain conditions. If Owen received additional compensation, the plan required him to pay 30% of it to the distribution trust.

A few months after the plan was confirmed, Owen implemented a scheme to defraud the reorganized debtor and avoid paying a portion of his compensation to the distribution trust. His scheme was not complicated. He simply opened a new bank account on behalf of Debtor and concealed its existence from the other members of Debtor's management team. He did not list the account on Debtor's books. He then diverted funds belonging to Debtor into that account. After the funds were in the off-ledger account, he transferred them to his personal bank account and spent the money at casinos in Las Vegas.

Owen diverted millions of dollars into the off-ledger account and then siphoned the funds into his personal account for his sole benefit. He was later convicted of laundering over $3.8 million in the off-ledger account, but his money laundering and theft likely far exceeded that amount.[1]

After Owen's theft was discovered, he resigned as an officer of Debtor and forfeited his ownership interest in the company. Shortly thereafter, Debtor filed its second (current) bankruptcy case.

In the second case, like the first, the court authorized Debtor to employ as accountants Trent Millican ("**Millican**") and the accounting firm where he was employed. Millican signed a declaration in support of the Application which stated: "Neither I, my firm, Postlethwaite & Netterville, APAC, nor any member or associate thereof, have any interest adverse to that of the estate, the trustee, or the Debtor in the matters upon which I am proposed to be engaged." (Doc. 27, Decl. ¶ 2). He further attested: "I believe that I am a 'disinterested person' within the meaning of . . . the United States Bankruptcy Code." (Doc. 27, Decl. ¶ 4).

Debtor had a longstanding professional relationship with the accountants that predated its first bankruptcy case. For many years, the accountants performed virtually all accounting services for Debtor, except for making deposits and

[1] Owen pled guilty to one count of money laundering in violation of 18 U.S.C. § 1957 arising from the theft of funds. *United States v. Brian T. Owen*, No. 24-cr-00214-SMH-MLH in the United States District Court for the Western District of Louisiana.

managing accounts receivable. They rendered general accounting advice, prepared and filed all tax documents, reconciled all bank statements and paid various vendors and consultants. They also compiled financial statements and reviewed them to determine whether they were free from obvious errors. To perform their services, they utilized their electronic access to Debtor's books and bank accounts.

After the second bankruptcy case was filed, Debtor's management tried to untangle the financial mess created by Owen's misdeeds. By then, they were aware of the existence of the off-ledger account, but they did not have access to its records. In March 2024 – nearly a year and a half after the case was filed – management finally obtained possession of the records which were produced in response to a subpoena issued to Citizens National Bank of Bossier City where the off-ledger account was established. Those records show that the accountant, Millican, co-signed the account agreement which opened the account. As co-signer, Millican had authority to disburse funds from the account and had access to its records the entire time. These facts were previously unknown to management.

The subpoenaed records show that Owen started using the off-ledger account for illicit purposes almost immediately after it was opened on March 31, 2021. On April 5, 2021, Owen transferred $1,050,000 from Debtor's account at Seacoast Bank to the off-ledger account at Citizens Bank. A few weeks later, Owen transferred an additional $124,000 from the Seacoast account to the off-ledger account at Citizens. The Seacoast statement for April 2021 identified each said transfer as "WIRE TO CITZ NTL BK NA RWDY, INC." which plainly indicated that the money was sent to an account established in the name of RWDY, Inc. at Citizens National Bank.

The accountants were responsible for reconciling all bank statements monthly. One of the primary benefits of outsourcing bank reconciliations is to reduce the risk of intentional manipulation and fraud. Millican assigned someone in his firm to perform the reconciliations. The firm performed a reconciliation for the April 2021 Seacoast account, but did not notify Debtor's management team that the statement revealed that $1,174,000 had been transferred from that account to another account. Notably, the accountants did not create a bookkeeping entry to accurately reflect the transfer from one account to another or add the Citizens account to the chart of accounts. Also, they did not disclose that Millican had signed an account agreement to open the Citizens account.

In addition to transferring money from Debtor's legitimate bank accounts to the off-ledger account, Owen used the off-ledger account to deposit checks that were made payable to Debtor, including five such checks from the United States Treasury. On April 30, 2021, the accountants prepared and filed with the Internal Revenue Service a form showing that Debtor was entitled to receive Employee Retention Credits ("**ERC**"). ERCs are refundable tax credits for certain eligible businesses that had employees during the Covid-19 pandemic. Debtor qualified for

ERCs based on its financial statements for 2020 and 2021. After a long delay, the IRS issued checks payable to Debtor totaling $3.8 million for the ERC payments. Owen obtained possession of them and deposited them into the off-ledger account. Then, he transferred the money to his personal account that he owned jointly with Millican and another person.[2]

Owen also used the off-ledger account to conduct numerous transactions with six merchant cash advance ("**MCA**") companies. These transactions resulted in deposits from the MCA companies into the off-ledger account aggregating over $7.2 million and disbursements to the MCA companies from that account aggregating over $6.6 million. The net proceeds from such transactions were used by Owen to gamble at casinos or to satisfy gambling debts. The MCA transactions did not benefit Debtor in any way. The MCA companies eventually filed claims in this case exceeding $10 million.

After learning of Millican's role in establishing the off-ledger account and Owen's use of it to commit crimes, Debtor's management concluded that the accountants breached their standard of care owed to Debtor. The accountants denied any wrongdoing. They also denied knowledge of Owen's unlawful activities. Millican testified that he was unaware that any money had been deposited into the off-ledger account. He thought it was an inactive or closed account.

In April 2024, Debtor and the accountants severed their ties. Thereafter, Debtor made a written request to The Society of Louisiana Certified Public Accountants asking for review of numerous claims against the accountants. Under Louisiana law, before a client can file a malpractice lawsuit against an accountant, the client must first submit the claims for review.

As part of its confirmed plan and pursuant to a court-approved compromise with certain claimants, Debtor transferred its interest in the accounting malpractice claims to the liquidating trust created by the plan. The trustee of the liquidating trust is the party seeking relief.

**Discussion**

The request for disgorgement of fees paid to the accountants is analyzed

---

[2] The instant motion refers to the joint account as a "hidden" account, but it was disclosed by Debtor in the first bankruptcy case. *See* Case No. 20-10616, Doc. 243-29, Ex. 20, Disclosure Statement (listing gambling debts of Owen and attaching copies of bank statements which identify Millican as a joint account holder). Millican testified that he became an authorized signer of Owen's personal account in 2017 because he needed access to Owen's account statements to negotiate with the IRS regarding an installment plan. Millican also testified that he did not access the account after 2017. Millican did not receive any of the stolen funds deposited into the joint account.

under § 328 of the Bankruptcy Code which provides, in relevant part:

> the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(c).

Under § 328(c), disgorgement is an authorized penalty for professionals who fail to satisfy the requirements of § 327.

Under § 327(a), a trustee is authorized to employ one or more professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties." § 327(a). This section establishes the application of a two-pronged test for the employment of professional persons. A trustee may employ professionals with court approval only if (1) they do not hold or represent an interest adverse to the estate, and (2) they are disinterested persons.

A "disinterested person" is a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." § 101(14)(C).

The Bankruptcy Code does not define the phrase "interest adverse to the estate" as used in § 327(a) or "interest materially adverse to the estate" as used in § 101(14)(C). Courts, including the Fifth Circuit, have held that a "party has an 'adverse interest' to the estate if they: '(1) [ ] possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) [ ] possess a predisposition under circumstances that render such a bias against the estate.'" In re Am. Int'l Refinery, Inc., 676 F.3d 455, 461 (5th Cir. 2012) (quoting In re West Delta Oil Co., 432 F.3d 347, 356 (5th Cir. 2005) (alterations in original)).

This court will apply the law developed under § 327 regarding disinterestedness and adverse interest to determine whether disgorgement is appropriate under § 328. The decision regarding disgorgement is within the discretion of the court. *Id.* at 461-62; In re Prince, 40 F.3d 356, 359 (11th Cir. 1994) ("[T]he language of 11 U.S.C. § 328(c) *permits* a court to deny compensation to professionals found not to be disinterested persons, but does not *require* a denial of

fees in those instances.") (emphasis in original). This is true even if the court learns that a professional never should have been employed under § 327(a) in the first place.

In this case, the motion alleges that Millican's "active role" in Owen's misdeeds and his "actions in concert with Owen" created an interest materially adverse to the estate. (Doc. 528, ¶ 49; Doc. 551, ¶ 34). According to the motion, at the time Millican signed his declaration, he: 1) had actual knowledge that "he had been instrumental in Brian Owen's misappropriation of millions of dollars from RDWY"; 2) knew or should have known that Owen had executed agreements with the MCA companies; and 3) knew or should have known that Owen had misappropriated funds and used them to gamble at casinos. (Doc. 528, ¶ 47).

Contrary to the trustee's allegations, the documentary evidence and testimony presented to this court did not establish that Millican acted "in concert" with Owen or was a co-conspirator with him or knowingly played an "active role" in Owen's misdeeds. The evidence also did not establish that Millican had actual knowledge of various transactions with the MCA companies. Nor did it establish that Millican knew that Owen used Debtor's funds to pay gambling debts.

While the evidence established that Millican knowingly helped Owen open the off-ledger account, it did not establish that he had actual knowledge that Owen used, or intended to use, that account for illicit purposes. Moreover, no evidence was presented to suggest that Millican financially benefitted from Owen's theft.

As for the trustee's contentions that Millican "should have known" about Owen's misdeeds, the court assumes he is suggesting that Millican, through the exercise of reasonable care and diligence, should have discovered Owen's use of the off-ledger account and owed a duty to inform Debtor's management team. In turn, the breach of that duty formed the basis of a cause of action belonging to the estate. The prepetition cause of action is an "interest adverse against the estate" because it is an economic interest "that would create either an actual or potential dispute in which the estate is a rival claimant." Am. Int'l Refinery, 676 F.3d at 461.

If that is the trustee's argument, the question becomes whether the accountants were disqualified under § 327(a) for a prepetition malpractice claim that was unknown at the time Millican signed his declaration. While all parties were aware of Owen's theft by the time the second bankruptcy case was filed, the dispute between Debtor and Millican did not emerge until nearly one and a half years later. As soon as the dispute emerged, Millican stopped working for the estate and did not seek additional fees.

If the accountants had been awarded compensation for services rendered *after* the emergence of a dispute with their client, this would be an easy case.

Disgorgement would be appropriate under that circumstance because the accountants and the estate would be rival claimants. Even the accountants would likely concede that point.

A more difficult question is whether the accountants should be required to disgorge fees for services rendered *before* Debtor accused them of malpractice and *before* they were aware that their actions or inactions might plausibly be construed as malpractice. The court, however, will not entertain that question because the trustee's motion and post-trial brief state, as the exclusive grounds for relief, that Millican "knowingly," "intentionally" or "recklessly" made a misrepresentation to this court about his firm's disinterestedness and lack of adversity. (Doc. 528, ¶¶ 49, 50; Doc. 551, ¶¶ 30, 35, 36). The trustee does not seek disgorgement based on Millican's *mistaken* belief that his firm was disinterested.

While there may be solid evidence to support the estate's causes of action based on negligence, the evidence does not support a finding that Millican "knowingly," "intentionally" or "recklessly" made misrepresentations to this court about his firm's disinterestedness and lack of adversity.

Lastly, the court notes that Bankruptcy Rule 2014 requires professionals to disclose all connections with parties in interest.[3] The motion, however, did not challenge the adequacy of the accountants' disclosure of such connections. Bankruptcy Rule 9013 provides that a motion must state its grounds "with particularity." Fed. R. Bankr. P. 9013; *see also* IRS v. Taylor, 132 F.3d 256, 262 (5th Cir. 1998) (reiterating this requirement). The court will limit its ruling to the grounds for relief specified in the motion. Therefore, the court will not examine whether the accountants adequately disclosed their connections.

Accordingly, **IT IS ORDERED** that all relief requested in the motion (Doc. 528) is **DENIED.**

###

[3] Bankruptcy Rule 2014 implements the disinterestedness provision of § 327(a) by requiring professional persons to make certain disclosures at the time they seek approval of their employment. Specifically, a professional must set forth any "connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Fed. R. Bankr. P. 2014(a). Under the rule, a professional must disclose all "connections" with parties in interest. Failure to disclose the required connections can warrant disqualification and disgorgement of any compensation already received.

the Plan), as well as the estimation of Amended Claim No. 5 filed by the Department of Treasury—Internal Revenue Service at $0.00 for voting and distribution purposes. This is because the Plan does not unfairly discriminate against, and is fair and equitable with respect to, the Holders of Claims in Classes 1, 3, 6, 7, and 8.

CC. Section 1129(c) – Only One Plan. The Plan is the only plan confirmed in this Chapter 11 case; therefore, the Plan and this Confirmation Order comply with Section 1129(c) of the Bankruptcy Code.

DD. Section 1129(d) – Principal Purpose of Plan. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, as amended. Therefore, the Plan complies with Section 1129(d) of the Bankruptcy Code.

EE. Section 1129(e) – Small Business Case. This Chapter 11 case is not a small business case within the meaning of the Bankruptcy Code. Accordingly, Section 1129(e) of the Bankruptcy Code is inapplicable to this Chapter 11 case.

FF. Assumption and Rejection of Contracts. Article VII of the Plan, governing the assumption and assignment or rejection of executory contracts and unexpired leases, satisfies the requirements of Sections 365(a), 365(b), and 365(f) of the Bankruptcy Code.

GG. Section 1125(e) – Good Faith Solicitation. The Plan Proponent has complied with Section 1125(e) in transmitting the solicitation materials and soliciting and tabulating votes and, as applicable, consent forms.

It is therefore **ORDERED AND ADJUDGED** that:

1. The Plan, attached hereto as **EXHIBIT A**, is **CONFIRMED** and **APPROVED** in all respects.
2. Findings and Conclusions. The Findings of Fact and Conclusions of Law set forth above constitute the findings of fact and conclusions of law of this Court pursuant to Federal Rule of Civil Procedure 52(a)(1), as incorporated by Bankruptcy Rule 7052. To the extent any finding of fact is later determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law is later determined to be a finding of fact, it shall be so deemed.
3. Notice: Notice was adequate and sufficient under the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, Orders of this Court, and the Due Process Clause of the United States Constitution.

Holder or Claimholder: "Holder" or "Claimholder" means any Entity that is the holder of a Claim, including but not limited to (a) a Claim that arose on or before the Petition Date, (b) a Claim against the Debtor's Estate of any kind specified in Section 502(g), Section 502(h) or Section 502(i) of the Bankruptcy Code, or (c) an Administrative Claim.

Impaired: When used with respect to any Claim, Interest or class, "impaired" has the same meaning as that contained in Section 1124 of the Bankruptcy Code.

Income Generated Taxes: "Income Generated Taxes" means all federal and state income taxes, FICA taxes, Medicare taxes, social security taxes, self-employment taxes, alternative minimum taxes, and other taxes owed on account of, and all other taxes on or measured by income, compensation, or benefits received by an employee.

Interest Holder: "Interest Holder" means any person or Entity holding an Equity Interest in the Debtor as of the Petition Date.

Litigation: "Litigation" includes, without limitation, the filing, commencement, continuation, and/or prosecution of motions, actions, lawsuits, or proceedings, or the pursuit of any Cause of Action, regardless of whether filed, initiated, commenced, or completed before or after the Effective Date. Without limiting the foregoing, "Litigation" also means and includes any matters or proceedings related to the administration of the Chapter 11 Case or the RWDY Distribution Trust.

Merchant Cash Advance Agreement or MCA Agreement: "Merchant Cash Advance Agreement" or "MCA Agreement" mean any agreement that a Merchant Cash Advance Claimant alleges to have been made between a MCA Claimant and the Debtor or any other agreement that a Merchant Cash Advance Claimant alleges to be the basis of a Claim against the Debtor.

Merchant Cash Advance Claimant or MCA Claimant: "Merchant Cash Advance Claimant" or "MCA Claimant" means and refers to each of the MCA Claimants that has filed a Claim, including Cannon Advance LLC d.b.a. Premier Funds [Claim 8], Cannon Advance LLC d.b.a. Premier Funds [Claim 9], Cannon Advance LLC d.b.a. Premier Funds US [Claim 12], GOAT Advance, LLC [Claim 14], Spin Capital LLC [Claim 15], Reliance Financial [Claim 16], MYNT Advance [17], Reserve Capital Management [18] and Slate Advance [19]. (The "MCA Claimants" do NOT include any RWDY Distribution Trust Beneficiaries.)

Merchant Cash Advance Claimant Claims: "Merchant Cash Advance Claimant Claims" means the claims filed in this Chapter 11 Case, which are identified and described as follows:

Claim Number 8 filed by Canon on March 24, 2023, and amended on April 25, 2024;
Claim Number 9 filed by Canon on March 24, 2023, and amended on April 25, 2024;
Claim Number 12 filed by Canon on March 29, 2023, and amended on April 25, 2024;
Claim Number 14 filed by Goat on March 31, 2023, and amended on April 29, 2024;
Claim Number 15 filed by Spin on March 31, 2023, and amended on April 29, 2024;

Respondents/Liable Parties: "Respondents/Liable Parties" means each and all of the Respondents/Liable Parties as defined in the Compromise Agreement. Notwithstanding anything to the contrary herein or in the Compromise Agreement, "Respondents/Liable Parties" neither means nor includes any person or entity who is a Released Person.

RWDY Account: "RWDY Account" means the RWDY Account as defined in the Compromise Agreement.

RWDY Case 20-10616: "RWDY Case 20-10616" means Bankruptcy Case No. 20-10616 filed by RWDY, Inc., on June 22, 2020 in the United States Bankruptcy Court for the Western District of Louisiana, Shreveport Division. In RWDY Case 20-10616, on January 21, 2021 the Court Confirmed Debtor's Plan of Reorganization [Docket No. 283].

RWDY Distribution Trust: "RWDY Distribution Trust" means the trust created through Confirmation of Debtor's Plan of Reorganization [Docket No. 283] in RWDY Case 20-10616. In accordance with § 6.6 of the plan confirmed in RWDY Case 20-10616, RWDY executed the Distribution Trust Agreement which formed the RWDY Distribution Trust, of which, Lucy G. Sikes serves as Distribution Trustee. A copy of the RWDY Distribution Trust Agreement is attached hereto as an Exhibit 2.

RWDY Distribution Trust Agreement: "RWDY Distribution Trust Agreement" means the RWDY Distribution Trust Agreement, a copy of which is attached hereto as Exhibit 2.

RWDY Litigation Trust: "RWDY Litigation Trust" means a trust formed by the MCA Claimants to receive and prosecute the Assigned Claims. "RWDY Litigation Trust" also means the trustee of the RWDY Litigation Trust.

Secured Claim: "Secured Claim" means a Claim of a Creditor arising on or before the Petition Date to the extent it is (a) secured by a lien on Collateral that is not void or avoidable under applicable state and federal law, including the Bankruptcy Code or (b) subject to set off under Section 553 of the Bankruptcy Code, limited in each of case (a) to the extent of the value of said Creditor's interest in the Debtor's interests in the property or (b) the amount of the set off, as applicable; provided, however, that nothing herein shall prohibit a Secured Creditor from making the election provided in Sections 1111(b)(2) of the Bankruptcy Code.

Secured Creditor: "Secured Creditor" means any Creditor that is the Holder of a Secured Claim.

Settled Actions: "Settled Actions" means, collectively, (a) Claims Objections or any other action related to a Claim: and (b) any and all claims and Causes of Action that the Debtor or the Distribution Trustee could assert against any non-debtor party, which claims and Causes of Action shall be fully and finally released pursuant to the Plan subject to the Bankruptcy Code and Bankruptcy Rules.

In addition to the Monthly Distribution Amount, after the Finally Allowed Claim filed by the Distribution Trustee as Claim 11 is paid in full, the amount equal to fifteen percent (15%) of the Reorganized Debtor's Net Profit for each of full calendar year following the Effective Date shall be disbursed to the Class 5 claimant until the aforementioned remaining balance of $4,217,466.60 is paid in full. During the first year in which the Finally Allowed Claim filed by the Distribution Trustee as Claim 11 is paid in full, such disbursement to the Class 5 claimant shall be in the amount remaining from the aforementioned fifteen percent (15%) of the Reorganized Debtor's Net Profit which has not been distributed to the Distribution Trustee. Thereafter, the amount equal to fifteen percent (15%) of the Reorganized Debtor's Net Profit for each subsequent year shall be distributed to the Class 5 claimant as necessary to pay the aforementioned remaining balance of $4,217,466.60 in full, with the final distribution to be in the amount that remains owing to the Class 5 claimant.

**5.5.3** The confirmation of this Plan will amend the provisions of the RWDY Distribution Trust Agreement to the extent necessary to implement the provisions herein.

**5.5.4** The Class 5 Claim is impaired under the Plan.

**5.6** <u>**The Merchant Cash Advance Claimant Claims (Class 6)**</u>:

**5.6.1** Class 6 shall consist of the Merchant Cash Advance Claimant Claims.

**5.6.2** The Merchant Cash Advance Claimant Claims have been compromised and settled according with the authorization of the Bankruptcy Court as set forth in the Order Granting Authority to Enter Compromise entered in the Bankruptcy Case as Document No. 437.

**5.6.3** According to the aforementioned Compromise and the Compromise Order, the effects of the Bankruptcy Court's approval of the Compromise Agreement are:

A. Each of the Allowed MCA Claims is allowed in the Bankruptcy Case in the amount for which such claim was filed as a general unsecured;

B. Claim Number 12 is disallowed in its entirety for the reason that it duplicates Claim Number 8 and Claim Number 9; Claim Number 12 shall not be an Allowed MCA Claim;

C. The MCA Claimants have released all rights under, and shall cancel, any filed UCC-1 financing statement against RWDY, provided that the MCA Claimants are not required to release any rights against any other person or entity under any filed UCC-1 financing statement or cancel the effect of any filed UCC-1 financing statement against any person or entity other than RWDY;

D. The MCA Claimants have waived and released any and all claims, rights, or causes of action, against the Released Persons and any and all claims, rights, or causes of action against RWDY's assets in respect to the RWDY Objections and Motions, Seacoast Objections and the Allowed MCA Claims ("MCA Release"), provided, however, that such waiver and release does not constitute a waiver or release of any claims, rights, or causes of action against any one or more of the Respondents/Liable Parties.

E. RWDY and Seacoast have waived and released any and all claims, rights, or causes of action, against each of the MCA Claimants, along with all members, managers, agents, officers, directors, employees, personnel, attorneys, accountants, and insurers, of each of the MCA Claimants in respect to the RWDY Objections and Motions, Seacoast Objections and the Allowed MCA Claims ("RWDY- Seacoast Release");

F. Prior to the filing of this Plan, RWDY has assigned the Assigned Claims to the RWDY Litigation Trust, including the rights to receive any proceeds thereof, in return for the MCA Release;

G. The RWDY Litigation Trust has accepted the assignment of the Assigned Claims to the RWDY Litigation Trust, including the rights to receive any proceeds thereof, in return for the RWDY- Seacoast Release of the Allowed MCA Claims;

H. The sole property that the MCA Claimants shall receive from RWDY as payment on, or otherwise on account of, the Allowed MCA Claims shall be the assignment by RWDY to the RWDY Litigation Trust of the Assigned Claims, including the rights to receive any proceeds thereof;

I. The terms of the Compromise Agreement are hereby incorporated into this Chapter 11 plan;

J. The terms of the Compromise Agreement shall have no adverse effect on Seacoast's rights, claims, interests or the treatment of Seacoast's rights, claims and interest arising prepetition, post-petition and/or post-confirmation under this Chapter 11 plan, or otherwise;

K. The effects of the Compromise Agreement and the approval thereof is that the Allowed MCA Claims have been unconditionally and irrevocably released, and all claims of the MCA Claimants, including, but not limited to, the Allowed MCA Claims, claims for any monetary amounts, claims of any rights, interests, liens, or security interests in any property of RWDY or RWDY's bankruptcy estate, further including, but not limited to, claims against any accounts or receivables of RWDY, claims under and/or in respect to any MCA Agreement Documents, claims against RWDY, the bankruptcy estate and/or any property of RWDY or the bankruptcy

estate, and claims against Seacoast, are deemed unimpaired by this Chapter 11 plan;

L. Notwithstanding that the Allowed MCA Claims shall be deemed to be unimpaired by this Chapter 11 plan, the MCA Claimants retain the right as parties in interest in the Bankruptcy Case to object to this Chapter 11 plan if and to the extent that this Chapter 11 plan would impair the MCA Claimants' rights under the Compromise Agreement; the RWDY Litigation Trust shall have no claim in the Bankruptcy Case; and

M. By virtue of the assignment, RWDY's rights in respect to the Assigned Claims are owned by the RWDY Litigation Trust immediately upon the assignment thereof, with each of the MCA Claimants having the right to share in any proceeds thereof on a pro rata basis according to the amounts of the respective Allowed MCA Claims as beneficiaries of the RWDY Litigation Trust.

Under the assignment, the RWDY Litigation Trust has all of the claims, rights, and causes of action against the Respondents/Liable Parties and may seek the recovery of all damages. The assignment by RWDY to the RWDY Litigation Trust of the Assigned Claims is wholly without recourse and without any warranty whatsoever of any type or nature, and is without any representation or warranty whatsoever as to: (a) the present or future solvency of any of the Respondents/Liable Parties; (b) the ability of any of the Respondents/Liable Parties to pay any amount; (c) the lack of defenses of any of the Respondents/Liable Parties to such claims, rights, or causes of action; (d) the propriety of the institution of any proceedings on any of such claims, rights, or causes of action; (e) the existence, nature, and/or scope of such claims, rights, or causes of action that the MCA Claimants will have on account of such assignment; (f) the organization of any of the Respondents/Liable Parties; (g) the relationships of any of the Respondents/Liable Parties to one another; (h) whether or not any of the Respondents/Liable Parties has been properly identified; and/or (i) any fact or circumstance concerning such claims, rights, or causes of action or otherwise. The MCA Claimants are deemed to have duly and diligently considered the potential merits of the aforementioned claims, rights, or causes of action and the aforementioned matters. Each of the MCA Claimants has expressly acknowledged that it is not relying to any degree whatsoever upon RWDY or its attorneys or any other person with respect to any of such matters.

NOTHING IN THIS PLAN shall be read as limiting the assignment of RWDY's rights in respect to the Assigned Claims.

RWDY agreed to use commercially reasonable efforts to maintain and prosecute the CPA Claims and Causes of Action until the assignment thereof became effective and further agreed to cooperate with the RWDY Litigation Trust in its pursuit and prosecution of the Assigned Claims after the assignment became effective. To that end, RWDY agreed that it: (a) shall have waived and shall be deemed to have waived all evidentiary privileges regarding its communications and/or relationship with Respondents/Liable Parties, including, without limitation, all privileges under Louisiana Rule of Evidence 515 and La. R.S. 37:86, (b) to the extent necessary to render

such waiver effective, is deemed to have assigned any and all such evidentiary privileges to the RWDY Litigation Trust, and (c) is deemed to have objected to Respondents/Liable Parties or any other person or entity seeking to assert such privileges. RWDY also agreed to make it officers, employees, and records reasonably available to the RWDY Litigation Trust in connection with the prosecution of the Assigned Claims. In the event that RWDY breaches or does not fulfill any of its obligations under this paragraph, the RWDY Litigation Trust's sole remedy on account thereof is to obtain specific performance of RWDY's obligations under this paragraph to cooperate with the RWDY Litigation Trust in their pursuant and prosecution of the Assigned Claims, and the RWDY Litigation Trust shall have no other remedy on account thereof.

It is the intention of RWDY and the MCA Claimants that the RWDY Litigation Trust shall receive RWDY's claims, rights, and causes of action that are defined and described as the Assigned Claims, which includes the CPA Claims and Causes of Action and the Related RWDY Claims against all of the Respondents/Liable Parties, who include Owen. RWDY has a judgment against Owen in the full and true sum of $27,204,990.83, together with judicial interest on the aforesaid amount from the date of this judgment until paid in full, and all costs, which judgment was rendered in Adversary Proceeding No. 23AP-1003 in the Bankruptcy Court. The assignment of the Assigned Claims includes the assignment of RWDY's rights under the aforementioned judgment insofar as the judgment includes the amounts recoverable on the Assigned Claims. RWDY retained its rights under the aforementioned judgment to collect any and all other amounts that are not part of the Assigned Claims and that are owed by Owen under the aforementioned judgment, and RWDY retained the right to execute on the aforementioned judgment for its sole account and benefit.

**5.6.4** As a result of the Compromise Agreement and the approval thereof, the Allowed MCA Claims are deemed to be unimpaired.

**5.6.5** As a result of the Compromise Agreement and the approval thereof, no distribution or payment is required to be made or will be made on any of the Merchant Cash Advance Claimant Claims.

**5.7** **<u>The U.S. Small Business Administration PPP CARES ACT Claim (Class 7)</u>**:

**5.7.1** Class 7 consists of the U.S. Small Business Administration PPP CARES ACT Claim in the post-forgiveness amount of $34,872.00.

**5.7.2** The Reorganized Debtor fully complied with the requirements for loan forgiveness pursuant to the Paycheck Protection Program under the CARES Act. As a result, the remaining post-forgiveness balance on the claim is $34,872.00. The claim will be paid in 60 monthly installment payments of $630.49 which includes interest at the rate of 3.25% per annum. The accrual of interest and the payments will commence on the 15th day of the first month following the Plan's Effective Date.

**5.7.3** The Class 7 Claim is impaired under the Plan.

| | | | |
|---|---|---|---|
| 11/14/2022 | | | filed by Stephen W. Sather for Debtor JET OILFIELD SERVICES, LLC (Attachments: #1 Proposed Order)) (Order entered on 10/21/2022)) |
| | | | 0 Main Document 7 pages 33.18 KB |
| 11/15/2022 | 79 (2 pgs) | | Notice of Appearance and Request for Service of Notice filed by Edward Carter for Creditor GIBSLAND BANK & TRUST. (Carter, Edward) |
| | | | 0 Main Document 2 pages 29.05 KB |
| 11/15/2022 | 80 (16 pgs; 2 docs) | | Application to Employ Postlethwaite & Netterville APAC as Accountant *(21 Day Objection Language)* filed by Stephen W. Sather for Debtor Jet Oilfield Services, LLC (Attachments: #1 Exhibit Order)(Sather, Stephen) |
| | | | 0 Main Document 15 pages 3.37 MB<br>1 Exhibit Order 1 page 83.17 KB |
| 11/15/2022 | 81 (6 pgs; 2 docs) | | Motion For Adequate Protection To Gibsland Bank & Trust *(21 Day Objection Language)* filed by Gregory Raymond Siemankowski, Stephen W. Sather for Debtor Jet Oilfield Services, LLC (Attachments: #1 Proposed Order)(Sather, Stephen) |
| | | | 0 Main Document 5 pages 262.00 KB<br>1 Proposed Order 1 page 90.34 KB |
| 11/16/2022 | 82 (3 pgs) | | Statement Regarding Final Cash Collateral Order filed by Mark Curtis Taylor for Interested Party The Official Committee of Unsecured Creditors of Jet Oilfield Services, LLC. (Taylor, Mark) (Related Document(s): 4 Motion to Use Cash Collateral filed by Stephen W. Sather for Debtor JET OILFIELD SERVICES, LLC (Attachments: # 1 Proposed Order)) |
| | | | 0 Main Document 3 pages 172.74 KB |
| 11/16/2022 | | | **Hearing CONTINUED FROM 11/16/22 TO 11/22/22** (Related Document(s): 4 Motion to Use Cash Collateral filed by Stephen W. Sather for Debtor JET OILFIELD SERVICES, LLC ) **Hearing Scheduled For 11/22/2022 at 09:30 AM at https://us-courts.webex.com/meet/Davis via Webex or Phone. Call 650-479-3207 Code:160 704 4630** ...*RESET IN OPEN COURT; NO FURTHER NOTICE TO BE GIVEN BY THE COURT*... (Lopez, Jennifer) (Entered: 11/17/2022) |
| | | | Hearing Held: DRAFT FINAL ORDER TO BE SUBMITTED FOR COURT'S REVIEW ON 11/21/22; HEARING 11/22/22 @ 9:30. (Related |

| | | | |
|---|---|---|---|
| 12/03/2022 | | | (Attachments: # 1 Proposed Order)) (Order entered on 12/1/2022)) Notice Date 12/03/2022. (Admin.) |
| | | | 0 Main Document 8 pages 210.65 KB |
| 12/03/2022 | 108 (6 pgs) | | BNC Certificate of Mailing (Related Document(s): 105 Order Regarding (related document(s): 44 Application for an Order approving, Effective as of October 12, 2022, the Agreement with Quadrus Consulting, Inc. to Provide (I) Angelo DeCaro, Jr. to Serve as the Debtor's Chief Restructuring Officer and (II) Services Related Thereto *(21 Day Objection Language*) filed by Stephen W. Sather for Debtor Jet Oilfield Services, LLC (Attachments: # 1 Proposed Order)) (Order entered on 12/1/2022)) Notice Date 12/03/2022. (Admin.) |
| | | | 0 Main Document 6 pages 179.56 KB |
| 12/07/2022 | 109 (8 pgs) | | Notice of Filing of Retention Agreement filed by Mark Curtis Taylor for Interested Party The Official Committee of Unsecured Creditors of Jet Oilfield Services, LLC. (Taylor, Mark) |
| | | | 0 Main Document 8 pages 663.42 KB |
| 12/09/2022 | 110 (10 pgs) | | Monthly Fee Statement of Waller Lansden Dortch & Davis LLP, Counsel for the Official Committee of Unsecured Creditors, for the Period Ending November 30, 2022 (*14 Day Objection Language*) filed by Mark Curtis Taylor for Interested Party The Official Committee of Unsecured Creditors of Jet Oilfield Services, LLC. (Taylor, Mark) |
| | | | 0 Main Document 10 pages 212.30 KB |
| 12/12/2022 | 111 (1 pg) | | Order Granting (related document(s): 80 Application to Employ Postlethwaite & Netterville APAC as Accountant *(21 Day Objection Language*) filed by Stephen W. Sather for Debtor Jet Oilfield Services, LLC (Attachments: #1 Exhibit Order)) (Party Postlethewiate & Netterville, APAC has been added to the case.) (Order entered on 12/12/2022) (Boyd, Laurie) |
| | | | 0 Main Document 1 page 115.87 KB |
| 12/13/2022 | 112 (4 pgs) | | Amended List of Creditors (adding or deleting creditor(s)), Adding Creditors , ( Filing Fee: $ 32.00 ) filed by Stephen W. Sather for Debtor Jet Oilfield Services, LLC. -Declaration for Electronic Filing due by 12/20/2022 (Sather, Stephen) |
| | | | 0 Main Document 4 pages 65.10 KB |

| | | | |
|---|---|---|---|
| 04/25/2023 | 191 (94 pgs) | ▢ | Amended Chapter 11 Monthly Operating Report for the Month Ending: 03/31/2023 filed by Stephen W. Sather for Debtor Jet Oilfield Services, LLC. (Sather, Stephen) |
| | | | ▢ 0 Main Document — 94 pages — 2.26 MB |
| 04/25/2023 | 192 (5 pgs) | ▢ | Objection Filed by Broocks Wilson for Creditors Goat Advance, LLC, Reserve Capital Management, LLC, Spin Capital LLC (Wilson, Broocks) (related document(s): 151 Disclosure Statement filed by Stephen W. Sather for Debtor Jet Oilfield Services, LLC. (Sather, Stephen) (related document(s): 145 Chapter 11 Plan filed by Stephen W. Sather for Debtor Jet Oilfield Services, LLC.)) |
| | | | ▢ 0 Main Document — 5 pages — 28.59 KB |
| 04/25/2023 | 193 (75 pgs; 5 docs) | ▢ | Adversary case 23-07003. Complaint filed by Goat Advance, LLC (attorney Broocks Wilson), Reserve Capital Management, LLC (attorney Broocks Wilson), Spin Capital LLC (attorney Broocks Wilson) against Jet Oilfield Services, LLC (Filing Fee: $ 350.00) (Nature(s) of Suit:(21 (Validity, priority or extent of lien or other interest in property)),(91 (Declaratory judgment))). (Attachments: # 1 Exhibit 1 - Goat Purchase Agreeemnt # 2 Exhibit 2 - Reserve Capital Purchase Agreement # 3 Exhibit 3 - Reserve Capital UCC # 4 Exhibit 4 - Spin Purchase Agreement) (Wilson, Broocks) |
| | | | ▢ 0 Main Document — 10 pages — 52.46 KB<br>▢ 1 Exhibit 1 - Goat Purchase Agreeemnt — 25 pages — 2.46 MB<br>▢ 2 Exhibit 2 - Reserve Capital Purchase Agreement — 21 pages — 1.29 MB<br>▢ 3 Exhibit 3 - Reserve Capital UCC — 4 pages — 79.43 KB<br>▢ 4 Exhibit 4 - Spin Purchase Agreement — 15 pages — 4.67 MB |
| 04/25/2023 | | | **Hearing CONTINUED FROM 4/25/23 TO 5/4/23** (Related Document(s): 155 First Application for Compensation *(21 Day Objection Language)*, Fees $ 68,012.50, Expenses $ 10.00, For Time Period From 10/16/2022 To Time Period Ending 2/28/2023 filed by Stephen W. Sather for Attorney Barron & Newburger, P.C. ) **Hearing Scheduled For 5/4/2023 at 10:00 AM at Austin Courtroom 1** (Lopez, Jennifer) (Entered: 04/26/2023) |
| 04/25/2023 | | | Hearing Held: WITHDRAWN. (Related Document(s): 143 Motion to Compromise and Settle with Brian T. Owen *(21 Day Objection Language)* filed by Gregory Raymond Siemankowski, Stephen W. Sather for Debtor Jet Oilfield Services, LLC (Attachments: # 1 Proposed Order Motion to Compromise and Settle with Brian T. Owen)) (Boyd, Laurie) (Entered: 04/26/2023) |